FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ FEB 1 5 2008 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- x

THE CITY OF NEW YORK,

         Plaintiff,

     -against-

BOB MOATES' SPORT SHOP, INC.; COASTAL TILE & ROOFING COMPANY, INC. d/b/a Coastal Pawn Shop; JOHN COSCIA d/b/a John's Gun & Tackle Room; FRANKLIN ROD & GUN SHOP, INC.; GWINNETT PAWN SHOP, INC.; HOT SHOTS, INC. d/b/a Hot Shots Jewelry & Pawn; MILLER ROD & GUN, INC.; RJS ENTERPRISES, INC. d/b/a Dick's Pawn Shop North; JERRY DALE ROOKS d/b/a Rooks Sales & Service; TCE OF VIRGINIA, INC. d/b/a Town & Country Pawn Shop; TOCCOA PAWN & VARIETY, INCORPORATED; TRADER WORLD, INC.;

         Defendants.

----------------------------------------------------------------- x

06-CV-6504

MEMORANDUM
& ORDER

**JACK B. WEINSTEIN, Senior United States District Judge:**

**I. Introduction**

The City of New York commenced this action in December 2006 against twelve gun retailers located in Georgia, Ohio, Pennsylvania, South Carolina and Virginia. In a similar action filed in May 2006, the City sued fifteen additional retailers on similar grounds. See City of New York v. A-1 Jewelry & Pawn, Inc., No. 06-CV-2233 (E.D.N.Y.) ("A-1 Jewelry & Pawn"). From the total of twenty-seven defendants in these two separate actions, fifteen have entered into settlement agreements with the City. Nine of the original twelve defendants in the instant action have settled. The remaining defendants are: (1) Bob Moates' Sport Shop, Inc. ("Moates' "); (2) Toccoa Pawn & Variety, Inc. ("Toccoa"); and (3) Trader World, Inc. ("Trader").

1

Pending before the court are motions to dismiss for lack of personal jurisdiction by Moates', Toccoa and Trader. Nearly identical motions to dismiss for lack of personal jurisdiction have been rejected twice by this court. See A-1 Jewelry & Pawn, 501 F. Supp. 2d 369 (E.D.N.Y. 2007), reconsideration denied, Order dated Sept. 27, 2007, Docket Sheet for No. 06-CV-2233 ("A-1 Docket") Entry No. 280 ("A-1 Personal Jurisdiction I"); A-1 Jewelry & Pawn, __ F.R.D. __, 2007 WL 4462448 (E.D.N.Y. Dec. 18, 2007), A-1 Docket Entry No. 402 ("A-1 Personal Jurisdiction II"). The defendants in this action advance the same legal arguments in support of the same kind of motion. Argument was heard on January 23, 2008.

For the reasons set forth below, defendants' motion to dismiss for lack of personal jurisdiction is denied. Trial is set for July 21, 2008.

**II.   Facts**

*A.   Overview*

An overview of the sources of information available to the City regarding guns sold by the defendants has been discussed in A-1 Personal Jurisdiction I and A-1 Personal Jurisdiction II. Familiarity with these two opinions is assumed. To briefly summarize, the City has available to it five general sources of information concerning guns sold by the moving defendants: (1) trace data from the National Firearms Trace Database, provided to the City by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), limited to guns recovered in New York City and New York State from 1994-2002; (2) trace data from the National Firearms Trace Database sold by ATF, through a private vendor, and available to the public until approximately 2001; (3) ATF trace requests made directly to a moving defendant that, if retained, should have been produced by defendants during the discovery in this action (the "Discovery Traces"); (4) court documents and related information generated in connection with federal criminal prosecutions; and (5)

2

AMERICANS FOR GUN SAFETY FOUNDATION, SELLING CRIME: HIGH CRIME GUN STORES FUEL CRIMINALS (January 2004) (the "AGSF Report").

Also discussed thoroughly in the two A-I Jewelry & Pawn personal jurisdiction opinions are a list of factors that are instructive in determining personal jurisdiction for gun retailers on a case-by-case basis:

- Number of handguns linked to criminal investigations in New York and elsewhere that are attributable to a gun retailer;
- Distribution practices of gun retailers as evidenced by the City's simulated straw purchases, gun trafficking prosecutions, and sales of multiple handguns to a purchaser by a retailer and their possible effects on crimes in New York;
- Time-to-crime of a retailer's guns recovered in New York; a short time-to-crime suggesting that a firearm was recently and illegally diverted from a retail outlet;
- Sales price and type of guns sold by a retailer since some brands of cheap handguns—known as "Saturday Night Special"—are favored by low-end criminals, have a short time-to-crime and are more likely to give rise to public nuisance and public danger when in the hands of prohibited purchasers;
- Crimes committed in New York with a retailer's guns;
- Total number of handguns the retailer sold in the United States and its total revenue from the United States and New York markets; and
- Receipt of a Demand Letter by the ATF—or the fact that a retailer has met the criteria for its receipt—because it is a determination by an administrative agency with expertise in the subject area that the retailer's practices are associated with the recovery of a disproportionate number of guns used in criminal activity.

Since the two personal jurisdiction decisions in the <u>A-1 Jewelry & Pawn</u> action, the City has obtained one new source of information not available to it before: serial numbers and brands of all handguns sold by Moates' from 2000 to September 2006 and by Trader and Toccoa from 2000 to September 30, 2007.

**A.     *Facts as to Each Defendant***

1. *Bob Moates' Sport Shop – Midlothian, Virginia*

| Traces from criminal investigations to handguns that Δ sold | Δ's distribution methods and their possible effects on crime in NY (e.g., straw sales) | Time to crime of Δ's guns recovered in NY | Sales prices, types and intended uses of handguns that Δ sold | NY crimes committed with handguns that Δ sold | Δ's total unit and dollar sales of guns in US and NY markets | Actions of regulatory authorities related to Δ's practices |
|---|---|---|---|---|---|---|
| ▪ 162 of Δ's guns were recovered in crimes nationwide from 1990-1997 (National FOIA Data).<br><br>▪ 31% of the 162 guns were recovered in crimes in states other than Virginia (National FOIA Data).<br><br>▪ About 18% of the 162 were recovered in connection with crimes in New York State (National FOIA Data).<br><br>▪ 26 of Δ's guns were recovered in New York State (New York Trace Data). | ▪ In a single month, Δ sold at least nine handguns to straw purchasers who trafficked them to New York and elsewhere (Ex. A). | ▪ At least 12 guns were recovered in New York less than three year after sale (New York Trace Data). | ▪ Approx. 14% of guns Δ sells are Sat. Night Specials (Δ's discovery responses).<br><br>▪ 42% of guns recovered in crimes in New York were Sat. Night Specials (New York Trace Data).<br><br>▪ More than one-third of guns recovered in crimes nationally, 1990-1997, were Sat. Night Specials (National FOIA Data).<br><br>▪ Nearly 20% of the guns recovered in New York had defaced serial numbers (New York Trace Data). | ▪ At least one homicide, assault, aggravated assault, and robbery (New York Trace Data). | ▪ 4,061 guns sold in US from 2000-2006 (Δ's discovery responses); assuming comparable sales figures, about 4% of guns sold annually 1990-1997 recovered in crimes (National FOIA Data). | ▪ Δ met criteria for ATF Demand Letter. |

5

a. *Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant*

Based on the National FOIA Data, 162 guns sold by Moates' were recovered in crimes nationally during the period 1990 to 1997. Moates's role in serving an interstate market is evident—about 31% of its guns appearing in the National FOIA Data were recovered outside of Virginia, with more than half of those out-of-state guns traveling to New York. During the period from March 1994 through October 2001, the New York Trace Data reveals that at least 26 guns sold by Moates' were recovered in New York State.

b. *Distribution Methods and Their Possible Effects on Crimes in New York – Straw Purchases*

Ian Blackstock, a New Yorker convicted of a felony, enlisted several straw purchasers to buy some 113 firearms for him from several Virginia gun dealers, including at least nine guns from Moates'. One of the straws bought three semi-automatic pistols for Blackstock in a two-week period in September 1990; in the same month, a second straw bought an additional two handguns from Moates', and a third straw bought four more handguns from Moates'. Blackstock paid the straws with a combination of cash and crack cocaine for their efforts, and resold the guns in New York and Washington, D.C. Eight of the nine guns that Moates' sold to Blackstock's straws were part of multiple sales.

c. *Time-to-Crime of Retailer's Guns Recovered in New York*

Consistent with the notion that Moates' handguns recovered in the City are trafficked guns, many have a short time to crime. See Blaustein & Reich, Inc. v. Buckles, 365 F.3d 281, 285 (4th Cir. 2004). Guns sold by Moates' were recovered in New York as soon as 72 days after sale, with at least three additional handguns recovered less than one year from date of purchase, and 46% recovered within three years.

d. *Sales Price and Types of Guns*

6

Approximately 14% of the handguns Moates' sells are "Saturday Night Specials." While this percentage is relatively low compared with some of the other defendants' sales, guns sold by Moates' bear other significant indicia of trafficking: of the guns sold by Moates' and recovered in New York (as shown in the New York Trace Data), 42% are Saturday Night Specials, as are more than one-third of the Moates' guns recovered in connection with crimes nationwide during an earlier interval (1990-1997) for which trace data is available. Moates' role in supplying the illegal gun market in New York is further evidenced by the fact that nearly 20% of its guns recovered in New York had defaced serial numbers.

e. *Crimes Committed in New York with Retailer's Handguns*

Some of the reported incidents involving Moates' guns include the following:

- In March 1997, a person killed by a gunshot to the head was found in the street in Queens, with a handgun lying alongside the body;

- In October 1996, a woman in a Bronx shoe store was robbed at gunpoint by a 15-year-old child who put a .38 caliber gun to her head and demanded money;

- In April 1997, a man was shot in the back while in the hallway of a public housing project in the Bronx;

- In February 2000, a 16-year-old in the Bronx was arrested for possession of a loaded 9mm Taurus handgun; and

- In August 1996, two people, including a 16-year-old child, were arrested in the Bronx with burglar's tools, and three loaded handguns.

See Complaint ¶ 66, Docket Entry No. 1

f. *Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets*

Moates' sold an estimated approximately 4,061 handguns between 2000 and 2006, an average of 580 handguns per year. The National FOIA Data shows 162 guns traced to Moates' over a seven-year period (1991-1997), or 23.1 per year. Thus, about 4% of the total handguns sold by Moates' in any given year ended-up recovered in connection with crimes.

g.  *Actions of Regulatory Authorities Related to the Gun Store's Distribution Practices*

Moates' met the criteria for issuance of a Demand Letter by the ATF.

2. *Trader World – North Charleston, South Carolina*

| Traces from criminal investigations to handguns that Δ sold | Δ's distribution methods and their possible effects on crime in NY (e.g., straw sales) | Time to crime of Δ's guns recovered in NY | Sales, prices, types and intended uses of handguns that Δ sold | NY crimes committed with handguns that Δ sold | Δ's total unit and dollar sales of guns in US and NY markets | Actions of regulatory authorities related to Δ's practices |
|---|---|---|---|---|---|---|
| • 39 of Δ's guns were recovered in New York crimes, Dec. 1994-Jan. 2002 (New York Trace Data)<br>• An additional 11 of Δ's guns were recovered in New York between 2004-2007 (Trader's discovery responses).<br>• 53 of Δ's guns were recovered in crimes nationwide (National FOIA Data).<br>• 79% of these guns were recovered in crimes in states other than South Carolina (National FOIA Data).<br>• About 45% (24 guns) were recovered in connection with crimes in New York State (National FOIA Data). | • Repeated instances of multiple purchases – at least 10 shown by available data (National FOIA Data). | • Average time for 39 guns = 2.44 years (New York Trace Data).<br>• At least 9 guns recovered less than one year from data of sale, and 69% recovered within three years of sale (New York Trace Data). | • Nearly half of guns sold by Δ and recovered in crimes in New York were Sat. Night Specials (New York Trace Data).<br>• 49% of guns sold by Δ and recovered in crimes nationwide 1990-1997 were Sat. Night Specials (National FOIA Data).<br>• 18% of guns recovered in New York had defaced serial numbers (New York Trace Data). | • Three homicides, assault, aggravated assault, and robbery (New York Trace Data). | • 7,678 handguns sold 2000-Sept. 2007 in US ((Δ's discovery responses). | • Δ met criteria for ATF Demand Letter. |

9

*a.   Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant*

Based on National FOIA Data, 53 guns sold by Trader were recovered in crimes nationally during the period 1990 to 1997. Guns sold by Trader move in an interstate market: 79% of the guns sold by Trader appearing in the National FOIA Data were recovered outside of South Carolina, with 45% of the total in New York.

During the period from March 1994 through October 2001, the New York Trace Data shows that at least 39 guns sold by Trader were recovered in New York. Trader's alleged contribution to the public nuisance in New York City is ongoing: based on matches between serial numbers and brands of handguns sold by Trader and the NYPD Ballistics Data, an additional 11 Trader guns have been recovered in crimes in New York.

*b.   Distribution Methods and Their Possible Effects on Crimes in New York – Multiple Sales*

The National FOIA Data confirms that handguns sold by Trader in multiple sales end up being recovered in crimes. For instance, two Hi-Points which Trader sold on February 10, 1994 turned up in crimes in New York City in March 1996 and June 1996, the former in an aggravated assault.

*c.   Time-to-Crime of Retailer's Guns Recovered in New York*

Consistent with the notion that the Trader guns recovered in the City are trafficked guns, they have a much shorter time-to-crime—2.44 years (New York Data)—than the six-year average for all ATF trace requests. See Blaustein, 365 F.3d at 285. Handguns sold by Trader were recovered in New York as soon as fourteen days after sale. At least nine guns sold by Trader were recovered within one year of sale, and 69% of Trader's guns recovered in New York were recovered under the three-year threshold that ATF sets for guns suspected of being trafficked.

*d.   Sales Price and Types of Guns*

Just over 15% of the handguns it sold from 2000 to 2006 are Saturday Night Specials. While this percentage is relatively low compared with some of the other defendants' sales, guns sold by Trader bear other significant indicia of trafficking; nearly half of Trader's guns recovered in crimes both in New York (1994-2001) and nationwide (1990-1997) were Saturday Night Specials; and almost one-fifth of Trader's guns recovered in New York had defaced serial numbers.

e. *Crimes Committed in New York with Retailer's Handguns*

The reported incidents involving Trader guns include the following:

- In June 1999, a 17-year-old boy was found in possession of a .22 caliber Intratec while riding his bicycle on a sidewalk in Brooklyn;

- In June 2000, a woman was robbed of her cell phone at gunpoint in her Manhattan apartment by two young men; and

- In August 2001, a 25-year old man opened fire on passengers on a Greyhound Bus at the Port Authority Bus Terminal in Manhattan, using a semiautomatic 9mm sold by Trader. The shooting ended only when a wounded passenger begged the shooter to spare the life of her 8-year-old daughter. Before the man was apprehended by police, four passengers were shot.

See Complaint ¶ 191.

f. *Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets*

Trader sold 7,678 firearms between 2000 and September 30, 2007, or an estimated 1,011 firearms per year.

g. *Actions of Regulatory Authorities Related to the Gun Store's Distribution Practices*

Trader meets the criteria for issuance of a Demand Letter.

11

3.  *Toccoa Pawn – Toccoa, Georgia*

| Traces from criminal investigations to handguns that Δ sold | Δ's distribution methods and their possible effects on crime in NY (e.g., straw sales) | Time to crime of Δ's guns recovered in NY | Sales prices, types and intended uses of handguns that Δ sold | NY crimes committed with handguns that Δ sold | Δ's total unit and dollar sales of guns in US and NY markets | Actions of regulatory authorities related to Δ's practices |
|---|---|---|---|---|---|---|
| ▪ At least 20 of Δ's guns were recovered in crimes in New York (New York Trace Data).<br>▪ An additional 10 of Δ's guns were recovered in New York since 2002 (Toccoa's discovery responses). | ▪ Δ demonstrates a willingness to engage in multiple sales: at least six of Δ's guns recovered in New York crimes – 30% – were sold in multiple purchases (New York Trace Data). | ▪ Average time for 20 guns = 3.30 years (New York Trace Data).<br>▪ At least 40% of Δ's guns recovered in New York were recovered in under three years (New York Trace Data). | ▪ More than one-quarter of guns Δ sells are Sat. Night Specials (Δ's discovery responses).<br>▪ More than one-third of guns sold by Δ and recovered in New York City were Sat. Night Specials (New York Trace Data). | ▪ Rape, assault, and robbery (New York Trace Data). | ▪ 2,548 handguns sold in US from 2000-Sept. 2007. | ▪ Δ meets the criteria for ATF Demand Letter. |

12

a.  *Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant*

New York Trace Data shows that at least 20 guns sold by Toccoa were recovered in connection with crimes in New York between 1994 and 2001. Matches between the NYPD Ballistics Data and serial numbers and brands of handguns sold by Toccoa reveal that Toccoa's handguns continue to flow into New York: an additional ten handguns recovered in New York since 2002, seven of them from 2004 onward.

b.  *Distribution Methods and Their Possible Effects on Crimes in New York – Multiple Sales*

Toccoa displays a readiness to engage in multiple sales. The New York Trace Data shows that Toccoa sold three identical Davis Industries P380 handguns on January 18, 1994, all of which were transported to the New York market and recovered separately in connection with crimes in 1994, 1997 and 1999. Multiple sales of identical guns on the same day are especially significant because Toccoa has a relatively low sales volume.

c.  *Time-to-Crime of Retailer's Guns Recovered in New York*

Consistent with the notion that the Toccoa guns recovered in the City are trafficked guns, they have a much shorter time-to-crime—3.30 years (New York Data)—than the six-year average for all ATF trace requests. See Blaustein, 365 F.3d at 285. Eight Toccoa guns—40%—were recovered in less than three years of sale, the threshold that ATF sets for guns suspected of being trafficked.

d.  *Sales Price and Types of Guns*

More than 25% of the handguns Toccoa sells are Saturday Night Specials; when other cheap brands of handgun favored by criminals, such as Davis, Raven, and Phoenix are included, the figure climbs to 31%. Of the guns sold by Toccoa and recovered in New York (as shown in the New York Trace Data), even more—fully one-third—are Saturday Night Specials.

*e.*     *Crimes Committed in New York with Retailer's Handguns*

The reported incidents involving guns purchased at Toccoa include the following:

- In February 1996, three young men—including a 16-year-old boy—arrested for attempting to steal a car in Brooklyn were in possession of a .380 caliber gun;

- In March 1998, a woman living in a single room occupancy building in Brooklyn was threatened by another occupant in possession of a .22 caliber gun;

- In August 1999, during a routine traffic stop in Brooklyn, a man driving with a suspended license was in possession of a .380 caliber gun; and

- In February 2000, five men, including three 19-year-olds, and two 20-year-olds, robbed a man at gunpoint in his apartment building in Brooklyn, brandishing two loaded handguns.

See Complaint ¶ 169.

*f.*     *Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets*

Toccoa sold a total of 2,548 handguns during the Relevant Period, an average of 332 handguns per year. Assuming Toccoa's annual sales volume was comparable during 1996-2001, 1% of handguns sold annually by Toccoa are recovered in crimes in New York.

*g.*     *Actions of Regulatory Authorities Related to the Gun Store's Distribution Practices*

Toccoa met the criteria for issuance of a Demand Letter.

**III.     Discussion**

The legal basis for exercising personal jurisdiction over these defendants has been set out in A-1 Personal Jurisdiction I, 501 F. Supp. 2d 369, reconsideration denied, Order dated Sept. 27, 2007, A-1 Docket Entry No. 280 and A-1 Personal Jurisdiction II, __ F.R.D. __, 2007 WL 4462448 (E.D.N.Y. Dec. 18, 2007). These decisions discuss at length the legislative history,

14

requirements and court interpretation of New York's long arm statute, N.Y. C.P.L.R. 302(a)(3), the federal due process limitations on the exercise of personal jurisdiction, and various factors bearing on prudential aspects of personal jurisdiction analysis applicable to gun manufacturers and distributors. Defendants in the instant action have not provided any reason to depart from the analysis in those two opinions.

In the instant action, the City has assembled, as to each moving defendant, strong evidence of a continuous, long-standing course of conduct having adverse effects in New York City. This evidence documents a practice of facilitating the illegal sale of guns for movement into the underground New York City crime market. The City has demonstrated that each moving defendant has maintained a long, profitable and continuing commercial relationship affecting people in the State of New York. Personal jurisdiction is sought here not simply to vindicate an individual right or to resolve an individual commercial dispute, but to protect the safety of an entire community.

The necessarily clandestine nature of the commerce at issue — with moving defendants aware that their participation in interstate gun sales could potentially subject them to criminal and civil prosecution — means that the evidence of that interstate commerce is unlikely to be openly displayed. Examination of defendants' financial statements and other records will seldom tell the full story. Rather, proof of interstate commerce requires reliance upon inferences drawn from frequently fragmented information. The parallel conduct, which each moving defendant knew about, jointly constitutes a major aspect of interstate commerce and has a particularly harmful effect on the safety of New Yorkers.

Like the defendants in the A-1 Jewelry & Pawn action, Moates', Trader and Toccoa unconvincingly argue that the City has not established that they committed a tortious act without

the state. As discussed in A-1 Personal Jurisdiction I and A-1 Personal Jurisdiction II, plaintiff need not now prove a prima facie case in tort. Feinberg v. Deloitte & Touche, No. 91-CV-4496, 1993 WL 330508, 1993 U.S. Dist. LEXIS 11749 (S.D.N.Y. Aug. 25, 1993). The plaintiff need only establish that the out-of-state conduct attributable to each defendant gives rise to a claim in tort. See Evans v. Planned Parenthood of Broome County Inc., 352 N.Y.S.2d 257, 257 (N.Y. App. Div. 3d Dep't 1974). At this stage of litigation, there is sufficient evidence to find a knowing violation of federal law on part of the defendants when they sold the handguns which ended up in New York City, as a predicate for a home state tort committed by each of the defendants.

Defendants' contention that they had no reason to expect that their sales of handguns outside of New York would produce lethal consequences in New York has been rejected. "[T]here is significant publicly available evidence such that any firearms distributor, by virtue of being in that business, should know of or foresee the existence of an underground market which transports guns from the Southeast to states in the Northeast, including New York." Hamilton v. Accu-Tek, 32 F.Supp.2d 47, 63 (E.D.N.Y. 1998). In light of the facts and analysis in Hamilton it should come as no surprise to any one participating in retail gun marketing that jurisdiction in New York might lie for illegal gun sales in other states.

The City's allegations and proof demonstrate the kind of "purposeful availment" that was absent in World-Wide Volkswagen Corp. v. Woodson, 444 U.S.286, 297 (1980). Alleged with abundant factual confirmation are facts that the defendants engaged in straw sales, knew, or should have known, that the apparent purchaser was acting on behalf of a prohibited purchaser, and knew, or should have known, that many of the guns it was selling illegally would be trafficked to New York and used in crimes committed in New York City.

Defendants assert that they should not be subject to New York long arm jurisdiction because they do not derive substantial revenue from interstate or international commerce. The City has provided an ample factual basis for concluding that each moving defendant earns substantial revenue from interstate commerce—revenues more than sufficient to subject them to suit in New York.

Unfounded is defendants contention that this court's exercise of personal jurisdiction over them would somehow offend Constitutional Due Process. First, defendants' long-standing contacts with New York—allegedly supplying guns over the course of more than a decade to individuals who traffic these guns to New York for criminal purposes—are far more than minimal. Second, case law establishes that fewer contacts with New York are required when, as here, the cumulative weight of evidence of many independent retailers knowingly contributing to a large flow of illegal weapons into New York favors acquisition of personal jurisdiction in this State.

The evidence analyzed under applicable jurisdictional criteria satisfies both New York's long-arm statute and federal due process. Given the information available to firearms retailers concerning straw purchases and the illegal traffic in guns, along with defendants' alleged sales practices, defendants' should have reasonably expected their acts to have serious continuing adverse consequences in New York.

New York has a strong interest in the safety its residents and territory from handgun violence as well as in regulating the illegal flow of handguns into its territory. By enacting strong gun control laws to protect its citizens from gun-related crimes New York has expressed a special public policy interest in the subject matter of this litigation. The activities which the defendants' are alleged to be involved in are illegal and against the public interest in all states.

Their alleged illegal practices hinder the ability of New York and the federal government to regulate the sale and ownership of firearms in accordance with extant statutes and contribute to serious criminal dangers in this City.

## IV. Conclusion

The motions to dismiss for lack of personal jurisdiction by defendants Moates', Trader and Toccoa are denied. Trial is set for July 21, 2008.

hearing.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: February 15, 2008
Brooklyn, New York